UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Christopher Polansky

     v.                             Civil No. 13-cv-458-JL
                                      Opinion No. 2016 DNH 012

Ann Marie McCoole

**MEMORANDUM ORDER**

This civil rights action turns squarely on the requirement of the Prison Litigation Reform Act (PLRA), see 42 U.S.C. § 1997e(a), that an inmate exhaust the Department of Corrections's formal grievance process prior to seeking recovery under 42 U.S.C. § 1983 in federal court.  By his Amended Complaint, the plaintiff, Christopher Polansky, seeks to recover for damages he allegedly suffered as a result of inadequate medical care during a one-month stay in the Residential Treatment Unit (RTU) at the New Hampshire State Prison for Men in Concord. He asserts an Eighth Amendment civil rights claim under 42 U.S.C. § 1983 and state-law claims for negligence and negligent infliction of emotional distress.  This court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 (federal question) and 1367 (supplemental jurisdiction).

The sole defendant in this case, Ann Marie McCoole, a registered nurse and Nursing Coordinator employed by the New Hampshire Department of Corrections, moves for summary judgment,

see Fed. R. Civ. P. 56, on Polansky's Eighth Amendment claim that
she provided inadequate medical care during his stay at the RTU.
After hearing oral argument, and for the reasons set forth below,
the court concludes that Polansky failed to exhaust the
administrative remedies available to him before filing this
action, as the PLRA requires.  The court therefore grants summary
judgment in favor of the defendant and dismisses Polansky's
Eighth Amendment claim.  Having done so, the court declines to
exercise supplemental jurisdiction over the remaining state-law
negligence claims.  28 U.S.C. § 1367(c)(3).

## I.   <u>**Applicable legal standard**</u>

Summary judgment is appropriate where "the pleadings, the
discovery and disclosure materials on file, and any affidavits
show that there is no genuine issue as to any material fact and
that the movant is entitled to a judgment as a matter of law."
Fed. R. Civ. P. 56(c).  To defeat such a motion, the party
opposing summary judgment "must set forth specific facts showing
that a genuine issue of material fact exists as to each issue
upon which she would bear the ultimate burden of proof at trial."
Torres-Negron v. Merck & Co., 488 F.3d 34, 39 (1st Cir. 2007)
(quotations omitted).  An issue is "genuine" if it may reasonably
be resolved in either party's favor at trial, and "material" if

it has the capacity to sway the outcome under applicable law. Vineberg v. Bissonnette, 548 F.3d 50, 56 (1st Cir. 2008) (quotations omitted).  In performing these calculations, the "court must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).  Where, as here, the party seeking summary judgment also bears the burden of proof at trial,[1] the court will not grant summary judgment unless, based on the record taken in this light, no reasonable jury could find for the nonmoving party.  See E.E.O.C. v. Union Independiente de la Autoridad de Acueductos y Alcantarillados de P.R., 279 F.3d 49, 55 (1st Cir. 2002); Winnacunnet Coop. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 84 F.3d 32, 35 (1st Cir. 1996).

## II.  **Background**

The following background summary, drawn from the complaint and the documents submitted in support of defendant's motion for summary judgment and plaintiff's opposition thereto, takes the

---

[1]As further discussed infra, the defendant has asserted the affirmative defense of failure-to-exhaust under 42 U.S.C. § 1997e(a).  She carries the burden of proving this defense at trial.  Jones v. Bock, 549 U.S. 199, 127 (2007).

approach described above and draws all reasonable inferences in Polansky's favor.

While incarcerated in the New Hampshire State Prison for Men in Concord, Polansky requested a transfer to the that facility's RTU so that he could attend counseling and group therapy sessions.  During his month-long stay in the RTU, between August 21, 2012, and September 20, 2012, Polansky was housed in the RTU's Secure Psychiatric Unit (SPU) infirmary.  The defendant was a Psychiatric Unit Nurse Coordinator there at that time.

As a paraplegic confined to a wheelchair, Polansky relied on equipment to move himself between his wheelchair and other surfaces, such as his bed.  During the majority of his stay in the RTU, the facility provided a trapeze unit over Polansky's bed, which allowed him to change positions using his arms alone, and a slide board, along which he could slide from one surface to another.  As a result of spending a significant amount of time in a wheelchair, Polansky suffered from decubitus, pressure sores, and ulcers.  Upon arriving at the RTU, he told the prison staff that using a slide board would exacerbate those conditions and injure him further.  He requested a Hoyer lift instead.[2]  A Hoyer

---

[2]A Hoyer lift, or sling lift, is a floor crane used to transfer a patient between two surfaces (e.g., a bed and a wheelchair) using a sling.  See Santos v. Sunrise Med., Inc., 351 F.3d 587, 589 & n.1 (1st Cir. 2003).

4

lift arrived in the state warehouse during the week of September 11, 2012, and was set up for Polansky's use on September 19, 2012.  While waiting for the Hoyer lift, Polansky used the slide board to move between his wheelchair and other surfaces.  The resulting friction led to open sores, about which Polansky complained to the prison staff.  Separately, Polansky also complained of constipation that resulted in bowel blockage.

Polansky submitted two Inmate Request Slips relating to his request for a Hoyer lift and his bowel blockage during his stay at the RTU.[3]  Specifically, on September 13, 2012, Polansky submitted an Inmate Request Slip addressed to a staff doctor, complaining that his "buttocks [were] pretty much shredded from using a slide board" asked for an examination and informing the staff that he had not "had a [bowel movement] now since 09-03-12."  Plaintiff's Ex. A-2.  He was told to speak to a nurse to schedule an examination with a provider.  Id.  On September 18, 2012, Polansky submitted another Inmate Request Slip, this time directed specifically to McCoole, asking for the Hoyer lift and for additional remedies for his bowel blockage.  Plaintiff's Ex. A-3.  The RTU staff made the Hoyer lift available to Polansky the

---

[3]Polansky also filed at least five other Inmate Request Slips during his stay at the RTU, but does not contend that they concern these issues, nor do they appear to do so.  See Defendant's Ex. B-1 at 1-3, 5, 7.

next day.  Polansky Aff't ¶ 10.  He left the RTU one day later,
on September 20, 2012.

    After leaving the RTU, Polansky continued to file additional
Inmate Request Slips complaining of pain and sores he claims were
caused by using the slide board during his RTU stay.  Plaintiff's
Exs. A-4 (September 23, 2012), A-5 (September 24, 2012), A-6a
(October 8, 2012), and A-6b (October 8, 2012).  He also
complained about the quality of the prison's water.  Plaintiff's
Exs. A-8 (January 31, 2013) and A-9 (February 5, 2013).  After a
slew of Inmate Request Slips cataloging various complaints,
Polansky filed two second-level grievances in early 2013.  The
first addressed his concerns about the quality of the water,
Plaintiff's Ex. A-11, and the second a previously undocumented
concern about the conduct of the mail room staff, Plaintiff's Ex.
A-12.

    Polansky commenced this action on October 16, 2013.  After a
year and several amendments to his complaint, Polansky obtained
counsel[4] and, on November 10, 2014, filed the operative Amended

---

    [4]Neither the Constitution nor any statute entitled Polansky
to counsel in this action.  In light of the proceedings in this
action and Polansky's prior sojourns in this District, the court
determined that the interests of justice would be served by his
having counsel.  After contacting several legal aid agencies who
were, unfortunately, unwilling or unable to take on Polansky's
case, the court appointed Matthew Cairns, Esq. from its roster of
volunteer pro bono counsel, the Pro Bono Volunteer Attorney

Complaint[5] asserting a single claim under the Eighth Amendment and two state law negligence claims against McCoole in her official and personal capacities.  McCoole moved for summary judgment on her affirmative defense that Polansky failed to exhaust his administrative remedies before bringing a suit in this court contesting prison conditions as required by the PLRA.

## III. **Analysis**

The defendant's motion for summary judgment turns on whether Polansky exhausted his available administrative remedies.  The exhaustion provision of the PLRA prohibits a prisoner from bringing any action "with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, . . . until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  Such a requirement "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court" which "has the potential to reduce the number of inmate suits, and also to improve the quality of suits that are filed by producing a useful administrative record."  Jones, 549 U.S. at 204.

---

Panel.  The court appreciates Attorney Cairns' advocacy on Polansky's behalf in this action.

[5]Document no. 66.

7

The PRLA "requires proper exhaustion," which means that an inmate taking advantage of the grievance process must comply with all of the prison's "deadlines and other critical procedural rules." Woodford v. Ngo, 548 U.S. 81, 93 (2006); see also Acosta v. U.S. Marshals Serv., 445 F.3d 509, 512 (1st Cir. 2006) (citing Pozo v. McCaughtry, 286 F.3d 1022, 1025 (7th Cir. 2002)).

Failure to exhaust administrative remedies is an affirmative defense. Jones, 549 U.S. at 216. To prevail on summary judgment, then, the defendant must show that no reasonable jury could find that Polansky exhausted the administrative remedies available to him before commencing this action. And she has done so here.

**1.   The DOC grievance process**

The New Hampshire Department of Corrections has promulgated administrative remedies in the form of an official, three-step grievance process. That procedure is set forth in the DOC Policy and Procedure Directive (PPD) 1.16, which the defendant has attached to her motion as Exhibit G. As this court has previously described the process:

> PPD 1.16 requires an inmate make an initial attempt --
> albeit an informal one -- to resolve any issue with the
> staff member involved. If that fails, a three-level
> grievance procedure is set in motion with the filing of

a written complaint -- known as an inmate request slip
(IRS) -- with the lowest level staff member authorized
to deal with the issue in question.  The IRS must be
filed within 30 days of the underlying incident or it
will be rejected as untimely.  Once filed, prison
officials are required to conduct an appropriate
investigation of the issues raised and provide a
written response to the inmate within 15 days.

At the second level, an inmate dissatisfied with the
prison's response may pursue further administrative
remedies by submitting a "grievance form" to the
Warden.  The inmate is afforded 30 days from the
receipt of the response to appeal to the Warden, who
then has 30 days to conduct any necessary investigation
and make a decision.

The third and final level of the grievance procedure
enables the inmate to appeal the Warden's decision to
the Commissioner of Corrections.  Any appeal to the
Commissioner must be filed within 30 days of the
Warden's response and the Commissioner in turn has 30
days to decide.  The Commissioner's decision is final.
See PPD 1.16, at 3-4; Inmate Manual, § D.  Until the
Commissioner has responded to the grievance, the inmate
has not fully exhausted all of his or her
administrative remedies.

Perfetto v. New Hampshire State Prison, 2008 DNH 77, 7-8.

The defendant here argues that Polansky's suit must be

dismissed because Polansky has not properly exhausted his

available administrative remedies with respect to his claims that

McCoole failed to provide him with adequate medical care by

"forcing him to use a physically injurious slideboard and an

unsanitary toilet/shower seat, and to endure prolonged

constipation and bowel obstruction . . . ."  Amended Compl. ¶ 31.

The court agrees.  As explained more fully below, see infra Part
II.3, the evidence -- even taken most generously in Polansky's
favor -- demonstrates that Polansky never availed himself of the
third tier of the DOC's grievance policy with respect to injuries
arising from use of the slide board or his bowel issues.  Nor
does the evidence admit the inference that he engaged the
administrative grievance process at all with respect to his
complaint about an unsanitary toilet and shower seat.  His
failure to fully and properly exhaust the administrative remedies
available to him is fatal to his request for judicial relief.

### 2.    Polansky's access to the grievance process

     The first question the court must address is whether the
grievance process described above was available to Polansky.  He
contends that it was not.  The PLRA makes clear that an inmate
need only exhaust those remedies "as are available." 42 U.S.C.
§ 1997e(a).  As this court has previously observed, giving the
language of the PLRA its plain and ordinary meaning,
"'[a]vailable' means accessible or capable of being possessed or
used." Knowles v. New Hampshire Dep't of Corr. Comm'r, 538 F.
Supp. 2d 453, 460 (D.N.H. 2008).  The evidence before the court
clearly shows that Polansky frequently complained through the
grievance process.  For example, the court has reviewed some

eighteen Inmate Request Slips submitted by Polansky between
August 20, 2012, and April 10, 2013,[6] and two phase two grievance
forms, submitted February 26, 2013, and March 8, 2013.
Polansky's frequent use of the grievance system undercuts his
various arguments that he lacked effective access to that system.

First, Polansky argues that he was unable to access the
grievance system because he "failed to consistently receive
responses to his Inmate Request Slips."  Plaintiff's Mem. at 8.
However, the evidence here demonstrates that Polansky received a
response to all but one of the Inmate Request Slips submitted as
evidence in support of or opposition to defendant's motion.[7]  See
Plaintiff's Exs. A-1 through A-10; Defendant's Ex. B-1.  Polansky
received responses to both of the Inmate Request Slips filed
during his RTU stay that addressed the issues raised in this
lawsuit, see Defendant's Exs. A-2 and A-3, as well as those filed
afterward, see, e.g., Defendant's Exs. A-4 and A-5.  The
frequency of Polansky's requests and the high rate of response
indicates not, as Polansky contends, that he lacked access to the

_____

[6]Polansky filed fourteen of these during the two-month
period between August 20, 2012 and October 24, 2012.

[7]The solitary Inmate Request Slip to which Polansky alleges
he never received a response -- and the court draws that
inference in his favor -- was his February 5, 2013 IRS submitted
to Warden Gerry on the subject of the prison's water quality.
See Plaintiff's Ex. A-9.

system, but that his access was adequate and that he was a frequent participant.

At oral argument, Polansky cast a new light on this position.  He had inadequate access to the administrative grievance process, he contended, because the process would take too much time to address the complaints at issue here -- that is, that the system fails in emergency medical situations.  However, the administrative process provides a safety valve for emergency situations.  The first step of the process is "waivable where an inmate can demonstrate that using the process 'is likely to result in an identifiable risk of harm to their physical safety or psychological well-being.'"  Knowles, 538 F. Supp. 2d at 460 (quoting PPD 1.16(IV)(A)(4)).  A direct approach to the warden, bypassing the Inmate Request Slip level, would require Polansky to have sought a waiver.  PPD 1.16(IV)(A)(4).  There is no evidence that he did so here.

Polansky's second argument, that the Inmate Requests Slips were inconsistently available to him, see Plaintiff's Mem. at 8, is equally unavailing for much the same reason.  The defect in Polansky's complaint here, as described in greater detail below, is not his failure to submit an Inmate Request Slip cataloging his complaints of insufficient medical care; it is his failure to

continue along the next two steps of the grievance process before filing this action.[8]  <u>See</u>, <u>infra</u>, Part III.3.  Any alleged lack of Inmate Request Slips fails to explain that discrepancy.  And, as discussed <u>supra</u>, the evidence shows that Polansky had access to Inmate Request Slips and employed them to complain about the conditions that he has raised in this lawsuit.[9]  His August 10, 2012, complaint about the staff's lack of response to prior Inmate Request Slips, which he filed before his move to the RTU on August 20, 2012, <u>see</u> Plaintiff's Mem. at 7; Plaintiff's Ex. A-1, sheds no light on the question of whether Polansky was able to exhaust his administrative remedies in seeking redress for the alleged defects in his care during his RTU stay.

Finally, invoking the imbalance of power between inmates and prison staff, Polansky contends that the grievance system was unavailable to him because McCoole and Warden Gerry actively discouraged him from using the system.  <u>See</u> Plaintiff's Mem. at 8.  Specifically, Polansky alleges that McCoole informed him that

---

[8]Indeed, Polansky's only arguable second-level grievance related to the issues raised in this case was actually submitted on an Inmate Request Slip addressed to Warden Gerry rather than the proper level two grievance form.  <u>See</u> Polansky Aff't ¶ 15; Plaintiff's Ex. A-8.

[9]Notably, when Polansky used an Inmate Request Slip to complain of a dearth of Inmate Request Slips, the staff responded by agreeing to increase the number of slips ordered for the unit. Plaintiff's Ex. A-13.

he would be "taken care of as far as the bowel blockage and the
Hoyer Lift, so long as [he] 'didn't rock the boat' or 'be
unreasonable'."  Polansky Aff't ¶ 6.  He took this to mean his
concerns would be addressed if he avoided complaining about them.
Id.  Similarly, he took the Warden's response to his March 8,
2013 grievance about contaminated water and mailroom malfeasance,
see Plaintiff's Ex. A-12, in which the Warden directed him to
file an Inmate Request Slip rather than raising the issue for the
first time in a grievance, as a deterrent to using the grievance
system at all.  Because of this discouragement, Polansky argues,
the grievance system was effectively not available to him.

Polansky's participation in the system again cuts against
him.  As explained supra, whether the system was "available" to
him turns on whether he was able to access or use it.  Knowles,
538 F. Supp. 2d at 460.  And, as this court explained in Knowles,
in light of Polansky's consistent employment of the system,
"[t]here is no question that the three-level grievance procedure
set forth in the Inmate Manual and promulgated by the DOC at PPD
1.16 was literally 'available' to the plaintiff."  Id.  Even
taking Polansky at his word that he was unable to obtain the full
sum of Inmate Requests Slips to which he was entitled and that
McCoole encouraged him not to "rock the boat," his continued
filing of Inmate Request Slips -- including complaints on the

14

subject of this action -- demonstrates that the "the grievance process was nonetheless always 'available' to him in the sense that the means to take advantage of it were available to him frequently enough to comfortably meet all of its procedural requirements and deadlines." Perfetto, 2008 DNH 77, 18.  Nothing in the record suggests that Polansky was dissuaded from filing grievances "to a degree that effectively made administrative remedies unavailable to him." Id. at 17-18.

For these several reasons, even viewed in the light most favorable to Polansky, the record leaves no question that the three-level administrative grievance process was available to him and that he took regular advantage of of it.

### 3.   Polansky's failure to exhaust administrative remedies

Having established that the DOC had an administrative grievance process in place that was available to Polansky, the court now turns to the question of whether Polansky exhausted his available remedies.  It concludes that he did not.

As described above, the three-step grievance process allows for an aggrieved inmate to attempt to resolve a complaint by filing an Inmate Request Slip.  If the administration's response to that request is unsatisfactory, an inmate may file a level two

15

grievance, bringing the issue to the Warden's attention.  If the Warden's resolution of the issue fails to satisfy the inmate, he may appeal that decision to the Commissioner of Corrections. This process is "highly formalized and standardized, with specific time frames and mandatory standardized forms. . . . [U]se of these forms and observance of these deadlines is required for 'proper exhaustion.'" Knowles, 538 F. Supp. 2d at 460 (citing Woodford, 548 U.S. at 93)).

Even under the most generous reading of Polansky's various submissions, the record contains no indication that he ever appealed those issues to the Commissioner of Corrections.  At best, Polansky may have filed a level 2 grievance on the issues raised in this lawsuit.  He addressed an Inmate Request Slip to Warden Gerry on January 31, 2013, in which he complained that wounds sustained while using the slide board may have become infected due to the prison's water, which to Polansky appeared dirty and contaminated.  Polansky Aff't ¶ 15; Plaintiff's Ex. A-9.  He alleges that this Inmate Request Slip was intended to serve as a level 2 grievance to the Warden.  Polansky Aff't ¶ 15. The court is skeptical that an Inmate Request Slip submitted in this context should be construed as a second-level grievance due to Polansky's misapprehension when Polansky in fact filed second-

level grievances on other matters, which strongly suggests he had knowledge of the process and was able to abide by it.  See Plaintiff's Exs. A-11 and A-12.  Even if the court considered this Inmate Request Slip as such a grievance, however, the court discerns no evidence to suggest that he raised any appeal to the Commissioner of Corrections -- let alone one related to the issues involved in this litigation.  Absent any such evidence, the court concludes that no reasonable question of material fact remains as to whether Polansky exhausted his available administrative remedies.  The defendant is, therefore, entitled to judgment as a matter of law that Polansky failed to satisfy the PLRA's exhaustion requirement before commencing this suit. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

## IV.  **State-law claims**

The court having disposed of Polansky's federal claim on summary judgment, only his state-law negligence claims against McCoole remain.  Where "the district court has dismissed all claims over which it has original jurisdiction," it "may decline to exercise supplemental jurisdiction" over remaining state law claim.  28 U.S.C. § 1367(c)(3).  Under these circumstances, where the federal claim is dismissed before trial, the balance of factors that the court considers when deciding whether to retain

17

supplemental jurisdiction over state law claims -- such as judicial economy, convenience, fairness, and comity -- will generally point toward relinquishing the claims to the state court.  Id. at 350 n.7.  Accordingly, the court "declin[es] to exercise [supplemental] jurisdiction over the remaining state-law claims," Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 (1988), and dismisses them.


**V.    Conclusion**

The undisputed facts in this case establish that the DOC's grievance policy was available to Polansky and that he failed to properly exhaust those administrative remedies.  Although he unquestionably complained about the issues currently before the court, his complaints did not constitute "proper exhaustion" under the PLRA.  Accordingly, defendant's motion for summary judgement[10] on her failure-to-exhaust affirmative defense is GRANTED.  The plaintiff's Eighth Amendment claim is dismissed without prejudice for his failure to exhaust administrative remedies.  His state-law claims are also dismissed.  The clerk shall enter judgment accordingly and close the case.

---

[10]Document no. 77.

18

**SO ORDERED.**

Joseph N. Laplante
United States District Judge

Dated: January 20, 2016

cc:  R. Matthew Cairns, Esq.
     Lynnmarie C. Cusack, Esq.